IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH,

CENTRAL DIVISION

| | |
|---|---|
| **FIDELITY & DEPOSIT COMPANY OF MARYLAND,** a Maryland corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**GORAN, LLC,** a Utah limited liability company; **SCOTT CUSICK,** an individual; **MARLISE CUSICK,** an individual; **TODD CUSICK,** an individual; **JENNIFER CUSICK,** an individual; **MINER CREEK, LLC,** a Utah limited liability company; **TJC FAMILY, LLC,** a Utah limited liability company; **CONSTRUCTION MATERIALS COMPANY, LLC,** a Utah limited liability company; **CMC ROCK, LLC,** a Utah limited liability company; **WESTLAKE MATERIALS, LLC,** a Utah limited liability company; and **CMC CONSTRUCTION, LLC**, a Utah Limited Liability Company,<br><br>Defendants and Third-Party Plaintiffs,<br><br>vs.<br><br>**WASATCH LEAVITT INSURANCE AGENCY, INC**., a Utah corporation f/k/a **ATKISON-LEAVITT INSURANCE AGENCY, INC**., an expired Utah corporation,<br><br>Third-Party Defendants. | ORDER AND MEMORANDUM DECISION<br><br>Case No. 2:17-cv-00604-TC-PMW<br><br>Judge Tena Campbell |

1

Plaintiff Fidelity & Deposit Company of Maryland (F&D) filed suit to enforce a general indemnity agreement (the 2014 GIA) signed by Defendants Goran, LLC, Todd Cusick, Jennifer Cusick, and Todd Cusick's other commercial entities (collectively, the "Goran Defendants.") The Goran Defendants executed the 2014 GIA in favor of F&D, a surety company that issued construction bonds for two of Goran's projects in Montana. F&D incurred losses when it paid out arbitration awards to three of Goran's subcontractors. F&D sought indemnification from Goran for its losses and filed this lawsuit to collect damages when it did not receive payment.

F&D now asks the court to grant summary judgment for its breach of contract claim against the Goran Defendants.[1] For the reasons set forth below, the court finds that the Goran Defendants are liable to F&D as a matter of law and F&D is entitled to summary judgment on its first claim for relief.

## FACTS[2]

Brothers Todd and Scott Cusick formed Goran, LLC, a commercial construction business, in 2012.[3] Todd agreed to provide the initial capital under several conditions: Todd would own 100% of the company and maintain ultimate control over Goran until his investment and other preexisting loans to Scott were paid back in full. Scott would work full-time for Goran and run the company's day-to-day activities. Todd and Scott organized Goran as a Utah limited liability company with Todd serving as Goran's manager and Todd's estate planning entity (TJC

---

[1] Specifically, F&D seeks summary judgment against Defendants Todd Cusick, the Jennifer Cusick Family 2012 Trust, Miner Creek, LLC, TJC Family, LLC, Construction Materials Company, LLC, CMC Rock, LCC, Westlake Materials, LLC, and CMC Construction, LLC. F&D does not seek summary judgment against Defendants Scott and Marlise Cusick.

[2] The following facts are either undisputed or based on evidence submitted as summary judgment exhibits and viewed in a light most favorable to the Goran Defendants. Immaterial facts and facts not supported by the record are omitted. See Hartford Fire Ins. Co. v. P & H Cattle Co., 451 F. Supp. 2d 1262, 1265 (D. Kan. 2006), aff'd, 248 F. App'x 942 (10th Cir. 2007).

[3] For clarity, the court refers to the Cusick brothers by their first names.

Family, LLC) listed as Goran's sole member. See Appendix of Evidence to Goran Defs.' Opp'n (ECF No. 107) ("Opp'n App.") Ex. 4 (Goran Operating Agreement) at CUSICK_048381-82 and 048400.

Todd placed internal controls on how Goran would operate. Scott could only bid on construction projects in the $1 million range that were located in Utah, and he needed to get Todd's approval before bidding. Scott was required to submit accounting records and other documents to Todd so that Todd could review the information, make decisions, and grant approvals.

Between 2012 and 2014, Scott submitted the appropriate records and obtained Todd's approval for small construction projects in Utah. Todd believed Goran was functioning as envisioned. But Todd was unaware that Scott was taking on large, out-of-state construction jobs. Scott maintained separate records for these projects which Todd did not see or know about. Scott even forged Todd's signature and later pled guilty to several felony counts of forgery and theft committed in connection with Goran.

Without Todd's knowledge, Scott, through Goran, contracted for several construction jobs for the state of Montana. Montana law requires that whenever the state enters into a construction contract, the contracting party must execute a construction bond with a surety company. See Mont. Code Ann. § 18-2-201 (2020). The bond guarantees that the contracting party will perform its obligations and pay its subcontractors.

In 2013, Scott approached Sam Carrick at Wasatch Leavitt Insurance Agency (Wasatch Leavitt) to obtain construction bonds. Wasatch Leavitt is an insurance agency and brokerage with relationships with several surety companies. Mr. Carrick brought Scott's bond request to Ron Mitchell of Zurich North America, F&D's parent company.

Mr. Mitchell became the primary F&D employee involved in establishing a bonding line for Scott. Mr. Carrick worked with Mr. Mitchell to open a new F&D bonding line at Scott's request. The Goran Defendants write extensively about Mr. Carrick's and Mr. Mitchell's respective duties, and how they failed to meet them, as underwriters for F&D. See Opp'n Br. at 8–22. Underwriting is the process through which a surety company or its agents decide to issue a bond—a form of credit—to a construction company. As underwriters, Mr. Carrick and Mr. Mitchell were supposed to investigate which individuals had the authorization to request bonds and sign indemnity agreements on behalf of Goran. They failed to do so and also neglected to follow other procedures described in F&D's underwriting manual.

Even though Mr. Carrick and Mr. Mitchell never researched whether Scott had the authority to obtain bonds on Goran's behalf, they ultimately approved the bonding line and issued numerous bonds to Goran. Two of these bonds were for road construction projects for the state of Montana: the Junction 419 bond (issued in November of 2013) and the Red Lodge bond (issued in February of 2014) (collectively, the "Montana projects" and "Montana bonds.") These two bonds created over $12 million in "surety credit" extended for Goran. See Opp'n App. Ex. 28 (Junction 419 contract and bond); Opp'n App. Ex. 29 (Red Lodge contract and bond). In connection with the new bonding line, Scott executed a general indemnity agreement with F&D on August 13, 2013 (the 2013 GIA). See Opp'n App. Ex. 31. The 2013 GIA lists Goran, Scott, and his wife Marlise Cusick as indemnitors in favor of F&D. Scott signed the 2013 GIA without Todd's knowledge or approval.

In April of 2014, Todd learned that Scott had forged Todd's signature on an unrelated document. Todd confronted Scott and immediately fired him. The next day, Todd went to

Goran's offices to take over its daily operations. Todd learned for the first time about the Montana projects and that Scott had concealed his work related to those jobs.

On that same day, Mr. Mitchell and Mr. Carrick arrived unannounced at Goran's offices and introduced themselves to Todd, who had never met them before. Todd told Mr. Mitchell and Mr. Carrick that he, not Scott, was the owner of Goran through his TJC Family entity. Mr. Mitchell and Mr. Carrick admitted that they knew Todd was Goran's manager and that they needed to have Todd's signature to bind Goran to any contracts. They told Todd that F&D had issued the Montana bonds at Scott's request, and Mr. Mitchell indicated that F&D was exposed to millions of dollars in potential liabilities related to those bonds.

Mr. Carrick said that Scott had been promising that Todd was "going to sign on these deals." Opp'n App. Ex. 1 (T. Cusick Decl.) ¶ 21. Mr. Mitchell pushed a document across the desk and asked Todd to sign. Todd refused, stating that Goran was not obligated on those projects. Todd said that he "wanted nothing to do" with the Montana bonds or any previous deal Mr. Carrick and Mr. Mitchell may have had with Scott. Id. He told them that they would have to pursue Scott for liabilities associated with those projects.

For several weeks after their meeting, Mr. Carrick frequently contacted Todd to ask if Goran could complete the Montana projects under Todd's management. Todd responded that he was in the process of uncovering many problems at Goran and could not commit to the completion of the Montana projects.

But eventually Todd decided that Goran should attempt to complete the Montana projects under his direction. Opp'n App. Ex. 1 (T. Cusick Decl.) ¶ 23. On May 7, 2014, Todd sent an email to Mr. Carrick stating that "Goran will operate as normal and will perform the jobs you [Mr. Carrick] have bonded under my management." Appendix of Evidence to Pl.'s Mot. for

5

Summ. J. ("Pl.'s App.") (ECF No. 98) Ex. 8 (T. Cusick 5/7/14 Email to S. Carrick). Throughout the spring of 2014, Goran engaged subcontractors and entered into contracts related to the Montana projects. For example, in May and June Goran entered into agreements with Warren Transport to provide trucking services for the Montana projects. Pl.'s App. Ex. 7 (Goran's Arbitration Br.) at 1–2.

Meanwhile, Todd learned of another potential construction job, the Toole Army Depot project, that Goran could take on to help it stay afloat through the winter while the Montana projects were paused. Todd needed to obtain a new bonding line for the Toole Army Depot project. He asked Mr. Carrick—who had been consistently reaching out to Todd—to see about securing this new bonding line. Todd also indicated that CMC, one of Todd's other companies, needed some reclamation bonds, and that Mr. Carrick could procure those bonds as well.

Mr. Carrick sought bonds for the Toole Army Depot project from Mr. Mitchell at F&D. Todd subsequently received an e-mail from Mr. Mitchell, and they communicated about indemnity for the new bonding line. At no time did Todd or Mr. Mitchell discuss whether indemnification would reach back to the Montana bonds that had been issued at Scott's request.

In August of 2014, Mr. Carrick presented Todd with a general indemnity agreement (the 2014 GIA). The opening paragraph lists Goran, Todd Cusick, Todd's late wife Jennifer Cusick,[4] and six other LLCs as indemnitors in favor of F&D for any bond issued by F&D in the name or on behalf of any indemnitor, whether issued before or after the 2014 GIA's execution. Pl.'s App. Ex. 11 (2014 GIA) at 1. The 2014 GIA states that indemnitors shall indemnify and hold F&D harmless from all liability arising from any bond. Id. at 1 ¶ 2.

---

[4] F&D's claims against Jennifer Cusick are now brought against the Jennifer Cusick Family 2012 Trust. See ECF No. 90.

Todd admits that he did not read the full 2014 GIA before signing it. He only read the very first part of the document which lists the names and addresses of the nine indemnitors. Todd did ask Mr. Carrick why all of the individuals and entities were listed together on one indemnification agreement when, in Todd's view, CMC's reclamation bonds were separate from Goran's Tooele Army Depot bond. Mr. Carrick told Todd that because Todd was going to be signing for all of the listed entities, all of the entities needed to be listed on the same agreement to complete the paperwork.

Todd signed the 2014 GIA on August 6, 2014, in his personal capacity and on behalf of Goran and his six other LLCs. Jennifer also signed it. Todd and Mr. Carrick never discussed whether the 2014 GIA applied to the Montana bonds, but Todd says he trusted that Mr. Carrick would not ask him to execute anything that contradicted his position that he, Goran, and his other entities would not incur liability for the Montana bonds.

Over the next two years, Goran continued to work on the Montana projects and negotiate subcontractor agreements. On February 9, 2015, Goran emailed F&D requesting "consent of surety" letters to add subcontractors and suppliers, including Big Sky Septic, to the Montana projects. Pl.'s App. Ex. 10 (J. Mojica 2/9/15 Email to R. Clarke). On April 27, 2015, under Todd's direct management, Goran entered into a vendor agreement with Mark Moore for supplies at the Red Lodge project site. Pl.'s App. Ex. 11 (Material/Equipment Supply Contract).

Ultimately Goran did not fully perform its obligations for the Montana projects and failed to pay Warren Transport, Big Sky Septic, and Mark Moore. After these three subcontractors won arbitration awards against Goran, F&D paid them a total of $799,709 in settlement payments for their claims against the Montana bonds. See Pl.'s App. Ex. 12 (F&D Resp. to Goran Interrog.

No. 2); Pl.'s App. Ex. 13 (F&D Settlement Agreements and Checks). F&D then brought this action to recover its losses from the Goran Defendants.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (internal quotation omitted). Should the nonmovant bear the burden of persuasion at trial, "[t]hese facts must establish, at a minimum, an inference of the presence of each element essential to the case." Id. (quoting Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d at 1215. But this is only true insofar as "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

## ANALYSIS

To succeed on its motion for summary judgment, F&D must show that the 2014 GIA is a valid and enforceable contract, F&D performed its contractual obligations, the Goran Defendants breached the 2014 GIA, and F&D suffered damages. See Bair v. Axiom Design LLC, 20 P.3d 388, 392 (Utah 2001). There is no dispute that Todd signed the 2014 GIA in his individual capacity and on behalf of Goran, F&D performed under the 2014 GIA by issuing (and paying on) bonds for the Montana projects, F&D incurred losses when Goran failed to pay its subcontractors, and that the Goran Defendants have not reimbursed F&D.

The court's only inquiry is whether there is a factual dispute regarding the 2014 GIA's validity and enforceability against the Goran Defendants for F&D's losses under the Montana bonds. F&D asserts that the Goran Defendants are bound by the plain language of the 2014 GIA—they must indemnify F&D for all past and future losses, including those related to the Montana bonds. The Goran Defendants raise three counter arguments against the 2014 GIA's enforceability. First, they argue that the 2014 GIA, by its terms, does not apply to the Montana bonds. At the very least, they claim that the 2014 GIA is an ambiguous contract that precludes summary judgment. Second, they argue that regardless of the 2014 GIA's ambiguity, Mr. Carrick's wrongful and fraudulent actions make the agreement voidable. Third, they contend that F&D's own negligence in issuing bonds to Scott Cusick renders the 2014 GIA void. For the following reasons, the court finds the 2014 GIA is a valid and enforceable contract that applies to the Montana bonds.

**I.     The 2014 GIA applies to the Montana bonds by its plain, unambiguous language.**

In Utah, the rules governing interpretation and construction of indemnity agreements are the same as those for other types of contracts.[5] Pavoni v. Nielsen, 999 P.2d 595, 599 (Utah Ct. App. 2000). The enforceability of a contract depends on the plain meaning of the text. Fairbourn Commercial, Inc. v. Am. Housing Partners, Inc., 94 P.3d 292, 295 (Utah 2004) (internal quotation marks omitted). The court will not grant summary judgment if finds an ambiguity in the text of a contract and a factual issue about the parties' intentions. Faulkner v. Farnsworth, 665 P.2d 1292, 1293 (Utah 1983).

If the language within the four corners of a contract is unambiguous, the court determines the parties' intentions from the plain meaning of the contractual language as a matter of law and does not consider extrinsic evidence. Bakowski v. Mountain States Steel, Inc., 52 P.3d 1179, 1184 (Utah 2002). If the language is ambiguous, then the court will consider extrinsic evidence of the parties' intentions. Id. But in determining whether an ambiguity exists in the first place, the court is not limited to the language of the contract: "[A]ny relevant evidence must be considered so that the court can place itself in the same situation the parties found themselves at the time of contracting." Peterson v. Sunrider Corp., 48 P.3d 918, 925 (Utah 2002) (quoting Ward v. Intermountain Farmers Ass'n, 907 P.2d 264, 268 (Utah 1995)).

---

[5] The Goran Defendants argue that the 2014 GIA is a contract of adhesion that should be strictly construed against F&D. Defs.' Opp'n at 33. But Utah law is clear that indemnity agreements are interpreted under the same rules of construction as other contracts. See, e.g. Free Motion Fitness, Inc. v. Wells Fargo Bank W., NA, 208 P.3d 1066, 1071 (Utah Ct. App. 2009). Indemnity agreements are only strictly construed when "the agreement purports to indemnify for another's negligent conduct." Developers Sur. & Indem. Co. v. Barlow, 628 F. App'x 980, 983 n.2 (10th Cir. 2015) (applying Utah law). The court discusses strict construction in the third subsection of this order, but first the court must determine whether the 2014 GIA, by its plain language, covers the Montana bonds. This is a different analysis from whether the 2014 GIA indemnifies F&D for its own negligence and accordingly, the court applies normal contract interpretation rules.

A contract provision is ambiguous if it is capable of "more than one reasonable interpretation because of uncertain meanings of terms, missing terms or other facial deficiencies." Peterson, 48 P.3d at 925. But terms are not ambiguous "simply because one party seeks to endow them with a different interpretation according to his or her own interests." Mind & Motion Utah Investments, LLC v. Celtic Bank Corp., 367 P.3d 994, 1001 (2016) (internal citations omitted). Alternative contract interpretations "must be plausible and reasonable in light of the language used." Id.

The opening paragraph of the 2014 GIA lists Goran, Todd and Jennifer Cusick, and Todd's six other LLCs,[6] as "Indemnitors . . . in favor of" F&D for

> any bond, undertaking, and/or obligation of suretyship or guarantee executed, provided or procured (herein "issued") by [F&D] in the name of or on behalf of any Indemnitor, any Related Entity, any other entity on request in accordance with this Agreement, or any combination thereof, whether issued prior to or after the execution of this Agreement, and all renewals, extensions, modifications, and substitutions of bonds.

Pl.'s App. Ex. 11 (2014 GIA) at 1 (emphasis added). The second paragraph states:

> Indemnitors shall exonerate, indemnify, and hold [F&D] harmless from any and all liability and Loss, sustained or incurred, arising from or related to: (a) any Bond (b) any Claim, (c) any Indemnitor failing to timely and completely perform or comply with this Agreement . . . Indemnitors shall promptly, upon demand, make payment to [F&D] as soon as liability or Loss exists, whether or not [F&D] has made any payment.

Id. The parties primarily disagree about the meaning of the phrase "in the name of or on behalf of" Goran.[7] F&D argues that this phrase clearly obligates the Goran Defendants to

---

[6] The entities are Miner Creek, LLC, TJC Family, LLC, Construction Materials Company, LLC, CMC Rock, LCC, Westlake Materials, LLC, and CMC Construction, LLC. All nine indemnitors are jointly and severally liable to F&D. Pl.'s App. Ex. 11 (2014 GIA) at 3 ¶ 18.

[7] The Goran Defendants also raise an issue about the meaning of paragraph 10 of the 2014 GIA, captioned "BONDS FOR OTHER ENTITIES." This paragraph reads that "Indemnitors' obligations under this Agreement shall also apply to any Bond Surety issues for or on behalf of any Related Entity." Pl.'s App. Ex. 11 (2014 GIA) at 2 ¶ 10. The Goran Defendants argue that

11

indemnify F&D for losses associated with the Montana bonds because those bonds were issued expressly for "Goran, LLC." The Goran Defendants say that because Scott requested the Montana bonds without actual or apparent authority to do so, those bonds were not issued for Goran and the 2014 GIA does not reach them.

The court finds that "in the name of or on behalf of" Goran is an unambiguous term. The plain language is clear: The 2014 GIA applies to all bonds that F&D issued for Goran, whether issued before or after the 2014 GIA's execution. F&D issued the Montana bonds before the 2014 GIA was executed and both bonds list "Goran, LLC" as principal and F&D as surety to be held to the State of Montana. Pl.'s App. Ex. 4 at F&D00021, F&D00030 (Bonds 9136808, 9136811). Consequently, the 2014 GIA applies to the Montana bonds.

In finding that the 2014 GIA is unambiguous, the court considers evidence that allows it to place itself in Todd's situation when he signed the 2014 GIA. Such evidence reveals that when Todd signed the 2014 GIA, he could not have interpreted it to exclude the Montana bonds because Goran had ratified those bonds several months earlier.

It is well settled that a principal may impliedly or expressly ratify an agreement made by an unauthorized agent,[8] so long as the principal has full knowledge of material facts and an intent to ratify. <u>Dillon v. Southern Mgmt. Corp. Retirement Trust</u>, 326 P.3d 656, 665 (Utah

---

Scott is not a Related Entity as defined by the 2014 GIA and the Montana bonds he requested must be excluded from its coverage. But because the court finds that the Montana bonds were issued by F&D "in the name of or on behalf of" Goran, it is immaterial whether the Montana bonds would also be covered based on paragraph 10.

[8] The parties are divided about whether Scott had apparent authority to sign the Montana bonds in Goran's name. The Goran Defendants argue that Scott lacked the power to enter Goran into contracts for the Montana projects because those projects were unauthorized and concealed from Todd. In F&D's view, Scott did have apparent authority to enter into contracts on behalf of Goran because he was tasked with Goran's day-to-day operations. But either way, Goran became bound to Scott's contracts when Todd adopted the Montana projects.

12

2014). Ratification cannot be revoked when "the principal has received and retained the benefit of the ratification." Id.

Right after learning about the Montana projects, Todd made it clear to Mr. Carrick and Mr. Mitchell that he wanted nothing to do with Scott's activities in Montana. He understood that Goran could not be held liable for Scott's dealings with F&D, and he explained this adamantly to Mr. Carrick and Mr. Mitchell.

But then he changed his mind and decided to continue with the Montana projects that were guaranteed by the Montana bonds. Todd told Mr. Carrick that Goran would assume responsibility for the Montana bonds when he stated that "Goran will operate as normal and will perform the jobs you have bonded under my management." Pl.'s App. Ex. 8 (T. Cusick 5/7/14 Email to S. Carrick). Under Todd's direction, Goran entered into trucking contracts for the Montana projects, further demonstrating Goran's intent to ratify the Montana bonds. Goran received the benefit of ratification because it was able to continue its construction work for the state of Montana.

It does not matter that Todd failed to read the 2014 GIA in full or that he, Mr. Carrick, and Mr. Mitchell never discussed whether it would apply to the Montana bonds. The law is clear that "that one party to a contract does not have a duty to ensure that the other has a complete and accurate understanding of all terms embodied in a written contract," and that "[e]ach party has the burden to understand the terms of a contract before he affixes his signature to it and may not thereafter assert his ignorance as a defense." McBroom v. Child, 392 P.3d 835, 843 (Utah 2016) (quoting Res. Mgmt. Co. v. Weston Ranch & Livestock Co., 706 P.2d 1028, 1047 (Utah 1985)). Todd cannot rely on his subjective belief that the Montana bond issues "had already been resolved in his initial meeting with Mitchell and Carrick" to escape the plain meaning of the

2014 GIA that he signed. Opp'n App. Ex. 1 (T. Cusick Decl.) ¶ 28. The 2014 GIA is unambiguous and applies to the Montana bonds. It must be enforced according to its terms.

##   II.   Mr. Carrick's actions do not make the 2014 GIA voidable.

The Goran Defendants argue that the 2014 GIA is voidable because Mr. Carrick fraudulently concealed that it applies to the Montana bonds.[9] Contracts that offend an individual, such as those arising from fraud or misrepresentation, are voidable. To establish a claim for fraudulent concealment or non-disclosure in Utah, a party must prove "(1) the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate." Smith v. Frandsen, 94 P.3d 919, 923 (Utah 2004) (quoting Hermansen v. Tasulis, 48 P.3d 235, 241–42 (Utah 2002)) (emphasis added).

Here, the material information—that the 2014 GIA applies to the Montana bonds—was disclosed to Todd. Mr. Carrick did not conceal this information. To the contrary, this information was clearly stated in the 2014 GIA's opening paragraph.[10] The Goran Defendants cannot meet their burden to show fraudulent concealment because the relevant material information was disclosed on the face of the 2014 GIA.

---

[9] The parties disagree about whether Mr. Carrick's actions can be imputed to F&D. See Defs.' Opp'n Br. at 35–38; Pl.'s Reply Br. at 10, 12. But regardless of whether F&D is vicariously liable for Mr. Carrick, the Goran Defendants have not met their burden to show that Mr. Carrick fraudulently concealed material information.

[10] The Goran Defendants note that Todd's failure to read the 2014 GIA should be excused because he had a confidential or fiduciary relationship with Mr. Carrick. See Opp'n Br. at 38 n.4 (citing Res. Mgmt., 706 P.2d at 1047.) But the 2014 GIA clearly states on its first page that it applies to the Montana bonds. Even if Todd was excused from reading the 2014 GIA, his failure to read what was plainly written before him cannot be considered "nondisclosure" by Mr. Carrick.

Even if the 2014 GIA was voidable based on Mr. Carrick's fraudulent concealment, Goran validated the 2014 GIA by ratifying it. A contract that is voidable because of fraud may be ratified at the election of the injured party, and it is "entirely within the right of the injured party to affirm it or treat it as valid and subsisting." Frailey v. McGarry, 211 P.2d 840, 845 (Utah 1949). Once ratified, the voidable contract is valid. Ockey v. Lehmer, 189 P.3d 51, 58 (Utah 2008). "It is well established in our case law that an individual cannot go along with a contract for the purpose of enjoying benefits that although not directly conferred by the contract, are nevertheless made possible as a result of the contract, only to later claim a right to rescind when he discovers the benefits . . .will not be great enough to compensate him for the loss he will sustain by reason of the fraud." Id. at 59 (internal quotations omitted).

Goran affirmed the 2014 GIA and reaped its benefits when it proceeded with the Montana projects. In fact, the 2014 GIA is the document that enabled Goran to receive benefits under the Montana bonds. F&D requires indemnity as consideration for the bonds that it issues. See Pl.'s App. Ex. 11 (2014 GIA) at 4 ¶ 27; Defs.' Opp'n at 17 ¶ 29(a). The Goran Defendants' promise to indemnify F&D under the 2014 GIA was "a material part of [F&D's] consideration" for the Montana bonds and "an inducement to [F&D] to … refrain from cancelling Bonds." See Pl.'s App. Ex. 11 (2014 GIA) at 1; 4 ¶ 27. Without the 2014 GIA, Goran may have lost the Montana bonds and, in turn, the ability to work on the Montana projects.

Goran chose to work on the Montana projects and enter into subcontractor and vendor agreements long after Todd signed the 2014 GIA. In February of 2015, more than six months after the 2014 GIA's execution, Goran requested F&D's consent to add Big Sky Septic as a subcontractor. Because Goran ratified the 2014 GIA and accepted its benefits, it cannot turn around and argue for rescission based on Mr. Carrick's actions at the time of execution.

### III. F&D's negligence does not make the 2014 GIA void.

The Goran Defendants contend that F&D's losses under the Montana bonds resulted from F&D's own gross negligence—and the negligence of its agent, Wasatch-Leavitt—in failing to follow proper underwriting procedures when it issued the Montana bonds at Scott's request. Because Utah courts hesitate to construe indemnity agreements to cover an indemnitee's own negligence, the Goran Defendants say that F&D cannot seek indemnification for losses connected to the Montana bonds.

Utah courts have generally held that an indemnity agreement which purports to make an indemnitor liable for the negligence of an indemnitee should be strictly construed against the indemnitee. Utah Transit Auth. v. Greyhound Lines, Inc., 355 P.3d 947, 953 (Utah 2015); Freund v. Utah Power & Light Co., 793 P.2d 362, 370 (Utah 1990). "The rule of strict construction requires that if a party intends to 'assume ultimate financial responsibility for negligence of another,' then that intention must be 'clearly and unequivocally expressed.'" Id. The policy rationale behind this rule is that in transferring liability for one's own negligence, "one might be careless of another's life and limb, if there is no penalty for carelessness." Hawkins ex rel. Hawkins v. Peart, 37 P.3d 1062, 1067 (Utah 2001) (quoting Hyde v. Chevron U.S.A., 697 F.2d 614, 632 (5th. Cir. 1983)). An indemnity agreement that relieves a party from future liability "may remove an important incentive to act with reasonable care." Id. at 1066.

The strict construction rule has been narrowed both in Utah and in other jurisdictions. See Pickhover v. Smith's Management Corp. 771 P.2d 664, 666–68 (Utah Ct. App. 1989) (describing changing trends in courts' application of the rule). In Freund v. Utah Power & Light Co., the Utah Supreme Court recognized the "growing trend to relax some of the strictness of the rule of construction when indemnity arises in a commercial context." 793 P.2d at 370. "We agree that in

strictly construing the contractual language, evaluating the indemnification agreement according to the objectives of the parties and the surrounding facts and circumstances is entirely appropriate." Id.; see also Ervin v. Lowe's Companies, Inc., 128 P.3d 11, 15 (Utah Ct. App 2005).

Most cases in which Utah courts have strictly construed indemnity agreements against the indemnitee involved "preinjury" indemnity agreements—a party agrees to release another from liability before becoming injured (usually physically) as a result of the indemnitee's negligence. See, e.g., Wollam v. Kennecott Corp., 663 F. Supp. 268, 272 (D. Utah 1987) (applying Utah law); Shell Oil Co. v. Brinkerhoff-Signal Drilling Co., 658 P.2d 1187, 1189–90 (Utah 1983). "The law generally treats preinjury releases or indemnity provisions with greater suspicion than postinjury releases." Hawkins, 37 P.3d at 1066.

The Goran Defendants frame this lawsuit as F&D's pursuit of indemnity for its negligent issuance of the Montana bonds to Scott. But when the court considers the facts and circumstances surrounding the 2014 GIA's execution, it finds that it is not appropriate to strictly construe the 2014 GIA against F&D.

First, the 2014 GIA is a postinjury release of liability. When Todd signed the 2014 GIA, he was well aware that F&D had issued the Montana bonds without his knowledge or approval. Mr. Mitchell had already acknowledged F&D's carelessness when Mr. Mitchell indicated that the issuance of bonds to Scott had exposed F&D to millions of dollars in liabilities. Unlike a preinjury indemnity agreement, the 2014 GIA did not encourage F&D to be careless. Rather, F&D's incentive in executing the 2014 GIA was to rectify its earlier carelessness. The purpose of the strict construction rule—to cause indemnitees to behave carefully even when they have transferred away their liability—is inapplicable to F&D's situation.

17

Second, strict construction of the 2014 GIA does not make sense in a commercial surety context. The purpose of a surety bond is to ensure the completion of a contracted-for construction project in the event that a party fails to meet its contractual obligation. The surety's right to indemnification from the principal on a surety bond arises from the surety's satisfaction of the principal's underlying obligation.[11] Indemnification is not based on the surety's own conduct but rather on the principal's failure to meet its obligations.

Goran is the principal obligor to the contracts it executed with Warren Transport, Big Sky Septic, and Mark Moore. As Goran's surety, F&D's obligations only arose when Goran failed to perform its contracts. If Goran had fully performed its contractual obligations to its subcontractors, F&D could not seek indemnity from Goran even though F&D may have still been negligent in issuing the Montana bonds at Scott's request. In this commercial surety situation, the 2014 GIA should not be strictly construed against F&D.

## CONCLUSION

Plaintiff F&D has met its burden to show that there is no genuine dispute of material fact regarding its breach of contract claim against the Goran Defendants. For the reasons described, the 2014 GIA is valid and enforceable against the Goran Defendants for F&D's losses related to the Montana bonds.

---

[11] Indemnification is an implied condition of the surety relationship. A surety's right to indemnification can arise even when there is no indemnification agreement, so long as the surety has performed the principal's obligations under the bonded contract and the principal has notice. See Restatement (Third) of Suretyship & Guaranty § 22 (1996). Even if the 2014 GIA was void, that would not necessarily preclude F&D from seeking implied indemnification from the Goran Defendants.

F&D's motion for summary judgment on its first claim for relief for breach of contract is GRANTED. Judgment is entered for F&D and against the Goran Defendants, jointly and severally, in the amount of $799,709 plus attorneys' fees and costs, which will be established at a future date. In the event that F&D incurs additional losses related to the Montana bonds, this amount of this judgment may be amended.

DATED this 17th day of December, 2020.

BY THE COURT:

_____
TENA CAMPBELL
U.S. District Court Judge